144 Cal.App.3d 123 (1983)
192 Cal. Rptr. 480
EL DORADO UNION HIGH SCHOOL DISTRICT, Plaintiff and Respondent,
v.
CITY OF PLACERVILLE et al., Defendants and Appellants; MACE LUMSDEN et al., Real Parties in Interest and Appellants.
Docket No. 21989.
Court of Appeals of California, Third District.
June 21, 1983.
*126 COUNSEL
Daryl J. McKinstry, City Attorney, for Defendants and Appellants.
Riley, Petersen, Combellack & Culver, Riley, Petersen & Combellack and Michael E. Petersen for Real Parties in Interest and Appellants.
McDonough, Holland & Allen, G. Richard Brown and Susan S. Franceschi for Plaintiff and Respondent.
OPINION
REGAN, Acting P.J.
This is an appeal by the City of Placerville (City) and Mace Lumsden and Lumsden, Inc. (Lumsden) from a judgment granting the El Dorado Union High School District's (District) petition for writ of mandate and an injunction. The trial court set aside City's approval of a tentative subdivision map for a proposed residential development and an environmental impact report (EIR) for that project, and prohibited City from allowing the project to proceed until an EIR is prepared analyzing the impact of the development on schools operated by District.
The dispositive issue on this appeal, not previously addressed in any jurisdiction, is whether the impact of increased student enrollment is cognizable under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] and the Guidelines issued by the State Resources Agency to implement CEQA (Cal. Admin. Code, tit. 14, § 15000 et seq., hereafter Guidelines). We conclude such an impact is within the purview of CEQA under the facts and circumstances of this case and affirm the judgment.

FACTS
In 1979 Lumsden applied to City for a zoning change, tentative subdivision map and a grading permit for a project known as Whispering Pines, located in the City of Placerville. The development, which contains approximately 166 acres, would consist of a total of 552 dwelling units.
Pursuant to a decision by the city council requiring one, a draft EIR was prepared for Lumsden in October 1979. The draft contained data on the *127 schools servicing the project, and estimated 386 high school and 221 elementary students would be added to the schools. Under "SUMMARY OF PRINCIPAL IMPACTS" [¶] "SCHOOLS," the draft stated "Increase in student enrollment." Under "Mitigation Measure":, the document stated "None required. The elementary school district within Placerville have [sic] been losing school enrollment. Also the high school district has adopted an impaction fee for all new residential construction."
In August 1979, District superintendent Herbert Hemington had written to Lumsden, advising him of the serious lack of facilities for high school students in District and the necessity of double sessions for the 1979-1980 school year. In order to acquire funds for the construction of new school facilities, District was now charging a fee based on the number of bedrooms in new dwelling units. Hemington also told Lumsden all residential development in District has an impact on the education and transportation of students. That letter was included as an exhibit to the draft EIR.
In December 1979, District received a copy of the draft EIR and notice of a public hearing by the planning commission. No one from District appeared at the commission's January 9, 1980, meeting. The following month, superintendent Hemington told City that District opposed any new development, stating the project would have a "significant impact" on District.
The final EIR, which was prepared in March 1980, stated: "6) Schools [¶] Mitigation Measure: None required." District again communicated its opposition to the project to City, referring to the serious lack of facilities for high school students in District.
Following its approval of Lumsden's request for rezoning and certification of the EIR, City filed a "Notice of Determination," required by CEQA, approving the rezoning of the property, on April 25, 1980. That document noted the project will not have a significant effect on the environment and that an EIR was prepared for the project. District then advised City it had adopted a mitigation fee, besides the impact fee already imposed, as an additional method of alleviating the impact of the proposed development. District reminded City of the serious lack of facilities for high school students, and repeated its opposition to the project pending collection of the mitigation fee.
On December 15, 1980, City invited District to comment on the tentative subdivision map for Whispering Pines. City used the same EIR previously filed for rezoning of the property to evaluate the map. District's response stated it was operating with 59 portable buildings, had 1,000 unhoused students, *128 and expected the overcrowding to continue. District estimated the project would generate approximately 88.3 high school students, and suggested the addition of these students would have a significant impact on District, requiring some kind of mitigation.
After the planning commission approved the subdivision map, District appealed to the city council. At the March 10, 1981, city council hearing, superintendent Hemington told council members the District was on double sessions for the 1978-1979 school year, added 59 portable classrooms the following year, and would add 10 more buildings in the future. He referred to a "cumulative impaction," which he suggested the developer should help mitigate. The hearing also disclosed Whispering Pines would generate 88.3 high school students.
The city council denied District's appeal and approved the tentative subdivision map. The council found: (1) the tentative map was consistent with the general plan; (2) it was questionable whether state law permitted the imposition of impact fees; (3) no new information requiring a supplemental EIR was brought before the council and the evidence of impact presented was known or could have been known prior to the council's April 1980 hearing on the zoning change, and (4) the previously approved EIR was adequate.
On March 23, 1981, City filed a notice of determination on the subdivision map, again noting the project will not have a significant effect on the environment and that an EIR was prepared. District filed its petition for writ of mandate and complaint for injunctive relief on April 21, 1981.
At the hearing on the petition, District introduced into evidence portions of a June 1979 report by the superintendent of schools titled "Demographic Study and Facility Needs."[2] That report projects gradual increases in total District enrollment during the next 20 years and recommends construction of at least one new high school to accommodate future growth.
The trial court made findings of fact and conclusions of law. It found the EIR contained no "meaningful discussion" of the impact of the project on District schools. The court ruled, inter alia: (1) CEQA requires City to consider the impact of a project on schools when there is evidence the project may have an adverse impact on school facilities; (2) there was substantial *129 evidence the project may have a substantial adverse impact on District; and (3) the determinations the project would have no impact on District and the EIR was adequate were not supported by substantial evidence.

DISCUSSION

I
City filed two notices of determination. The first, in connection with the rezoning, was filed April 25, 1980. District did not seek review of that action. The second, relating to the subdivision map, was filed March 23, 1981. District's suit challenged that action.
(1) The trial court ruled the proper statute of limitations commenced when City filed its second notice of determination, and District's action was filed timely. Lumsden and City assert the filing of the first notice commenced the running of the statute. As District did not file suit until almost a year from that date, they allege District's action is barred by the applicable 30-day statute of limitations.
After the public agency approves or determines to carry out a project subject to CEQA, it must file a brief notice, called a notice of determination. (Guidelines, § 15035.) This notice shall include the determination of the local agency whether the project will have a significant effect on the environment and whether an EIR was prepared. (§ 21152, subd. (a); Guidelines, § 15085, subd. (h).) The filing of the notice of determination begins a 30-day statute of limitations on court challenges to approval of the project under CEQA. (§ 21167, subd. (c); Guidelines, § 15085, subd. (h)(4); International Longshoremen's & Warehousemen's Union v. Board of Supervisors (1981) 116 Cal. App.3d 265, 271 [171 Cal. Rptr. 875].)
Lumsden contends the law does not require it to seek approval of an EIR for each stage of a project. As it points out, "project" means the whole of an action, a series of activities that may result in a physical change in the environment. (Guidelines, § 15037, subd. (a); § 21065.) Therefore, when the EIR was certified in City's first notice of determination approving the rezoning, the statute of limitations commenced for the project as a whole.
It is true that, although a project may be subject to various approvals as it proceeds to completion, the term "project" itself does not mean each separate governmental approval. (Guidelines, § 15037, subd. (c).) On the other hand, language in both statute and regulation suggests such "activities" as approval of a rezoning request and tentative subdivision map are *130 separate projects. (§ 21065, subds. (a) and (c); Guidelines, § 15037, subds. (a)(1) and (a)(3) and subd. (b).)
In any event, City elected to file two notices of determination. There was no subdivision map pending for consideration by City when the rezoning was approved. That City chose to use the same EIR for both the rezoning and the subdivision map is of no moment, for the limitations period does not run from certification of the EIR but from the filing of the notice of determination. (§ 21167, subd. (c).)
City could have waited and filed one notice after approval of both the rezoning and the map. Its decision to file two notices, whether or not proper under CEQA, should not foreclose a challenge to the EIR as it relates to the subdivision map, which was not before City when it filed the first notice. If the public agency files more than one notice of determination, we perceive that CEQA permits suits challenging the agency's action filed within 30 days of the last notice. Accordingly, the trial court was correct that District timely filed its action.

II
Lumsden and City contend there was no substantial evidence the project may have a significant effect on District and that potential increases in student enrollment are not cognizable under CEQA.
(2) We first address the standard of review governing this case. That standard requires the reviewing court to determine whether the decision of the government body is supported by substantial evidence in the light of the whole record. (§ 21168; Topanga Assn. for a Scenic Community v. County of Los Angeles (1974) 11 Cal.3d 506, 510 [113 Cal. Rptr. 836, 522 P.2d 12].) We may not substitute our own judgment for that of the local entity, and we must resolve any reasonable doubts in favor of the findings and decision. (McMillan v. American Gen. Fin. Corp. (1976) 60 Cal. App.3d 175, 182 [131 Cal. Rptr. 426].)
Under CEQA, if a project may have a significant effect on the environment, an EIR is required. (§§ 21100, 21151; Guidelines, §§ 15080, 15084; No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 74 [118 Cal. Rptr. 34, 529 P.2d 66].) "Significant effect on the environment" means "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the activity including land, air, water, minerals, flora, fauna, ambient noise, and objects of historical or aesthetic significance." (Guidelines, § 15040; § 21068.) "Environment" is defined *131 as "the physical conditions which exist within the area which will be affected by a proposed project...." (§ 21060.5; Guidelines, § 15026.)
Lumsden and City assert the potential of increased student enrollment is not embraced by CEQA, which is concerned with the physical environment. The CEQA Guidelines refer to projects having "a potential for resulting in a physical change in the environment...." (Guidelines, § 15037, subd. (a).) In Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 265 [104 Cal. Rptr. 761, 502 P.2d 1049], our Supreme Court stated it is projects "culminating in physical change to the environment" that trigger the procedural protections of CEQA. The sections of CEQA requiring agencies to file an EIR where there may be a significant effect on the environment were amended in 1981 to provide "any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions...." (§§ 21100, 21151.)
District claims crowded classrooms are physical, not social impacts. It points out the Guidelines require consideration of whether the environmental effects of a project will cause substantial adverse effects on human beings. (§ 21083, subd. (c).) As to the 1981 amendments, District cites the declaration of an Assistant Secretary for Resources, who stated the Resources Agency believes: (1) the amendments did not change existing law; (2) the position that adverse effects on people must be considered when they result from physical changes in the environment remains unchanged; and (3) a project that increases the number of students in a particular school, causing overcrowding, is subject to CEQA.
Whether increased student enrollment and the potential for overcrowding, by themselves, are sufficient to implicate CEQA is problematic. (3) Where, as here, the record contains ample evidence of present overcrowding, projections of gradually increasing high school enrollment, and the necessity for construction of at least one new high school, we hold CEQA requires an EIR that addresses the impact Whispering Pines, a 552-unit project, may have on District.
We find support for our conclusion such impact is within the purview of CEQA in Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779 [187 Cal. Rptr. 398, 654 P.2d 168]. In Fullerton, the State Board of Education had approved a plan to create a new school district. (Id., at p. 784.) The plan would likely require construction of a new high school and might result in abandonment of other facilities. It would also change bus routes and schedules and affect traffic patterns. (Id., at p. 794.) Our Supreme Court, declaring that implementation of the plan *132 raises "the possibility of a significant impact," held the board's failure to undertake an initial study to determine whether an EIR was required violated CEQA. (Id., at pp. 794-798.)
Similarly, the record here discloses substantial evidence of the necessity for construction of at least one new high school as a consequence of projects such as Whispering Pines. As Fullerton held, such evidence amply supports the finding that CEQA applies, requiring evaluation of the project's environmental impact.

III
(4) Having held the impact of the project on District is cognizable under CEQA, we address the adequacy of the EIR relating to that issue. The trial court ruled the decision of City that the EIR was adequate was not supported by substantial evidence. Lumsden and City assert the EIR, although it was not so required, nevertheless adequately assessed the impact of the project on District.
The fundamental purpose of CEQA is to ensure "that environmental considerations play a significant role in governmental decision-making...." (Friends of Mammoth, supra, 8 Cal.3d at p. 263.) The EIR is the heart of CEQA. (Citizens of Lake Murray Area Assn. v. City Council (1982) 129 Cal. App.3d 436, 440 [181 Cal. Rptr. 123].) Its purpose is to provide public agencies and the general public with detailed information about the effects of a proposed project on the environment. (§ 21061; Guidelines, § 15150; Environmental Planning & Information Council v. County of El Dorado (1982) 131 Cal. App.3d 350, 354 [182 Cal. Rptr. 317].)
The EIR here is clearly inadequate. The draft EIR contained data on the expected student yield for the project and acknowledged an increased student enrollment. The report then stated no mitigation measures were required, because the elementary schools have experienced a decline in enrollment and District has adopted a special fee for new residential construction. Letters from District and another area school district were included as exhibits. The final EIR merely stated no mitigation measures were required. It contained no discussion of the impact of the project on District and no mention of District's opposition to the project.
The EIR should contain sufficient information to enable public agencies to make decisions that consider environmental consequences. (Guidelines, § 15150.) The EIR here falls woefully short of that standard. Although the draft recognized an increase in student enrollment, neither report said anything *133 about the effects of such an increase in the student population, and suggested no mitigation measures to deal with such an impact, required by the Guidelines. (§ 15143, subds. (a), (c) and (g).) Nor is there any discussion of the cumulative impact of projects such as Whispering Pines on District, which CEQA expressly requires. (§ 21083; Guidelines, §§ 15023.5, 15143, subd. (a).) Finally, District had advised the City in February 1980 the special impact fee it had imposed would not fully meet its needs.[3] On this record, we cannot assume City made any evaluation of the impact of the project, much less the kind of detailed evaluation CEQA contemplates under these circumstances.

IV
The trial court ruled City's certification of the EIR and approval of the tentative subdivision map were arbitrary and capricious, and awarded District $1,500 attorney's fees, pursuant to Government Code section 800.
(5a) City contends the court erred in awarding attorney's fees. It argues that, as it provided District with a hearing on District's appeal of City's approval of the subdivision map, its actions were not arbitrary or capricious.
The determination that government conduct is arbitrary or capricious is essentially one of fact and will be upheld on appeal, absent an abuse of discretion. (A.B.C. Federation of Teachers v. A.B.C. Unified Sch. Dist. (1977) 75 Cal. App.3d 332, 343 [142 Cal. Rptr. 111].) (6) The phrase "arbitrary or capricious action or conduct," as used in Government Code section 800, has been characterized as conduct not supported by a fair or substantial reason or as unsubstantiated determinations. (A.B.C., supra, at p. 343.)
(5b) City's challenge is directed to the sufficiency of the evidence for the court's ruling on attorney's fees. The only support for this challenge City cites in its brief is the fact District was accorded a hearing before the city council. The record obviously contains a multitude of other evidence on this issue. City's failure to present all material evidence on the issue of arbitrary or capricious conduct constitutes a waiver of any alleged error. (Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 881-882 [92 Cal. Rptr. 162, 479 P.2d 362].)
*134 The judgment is affirmed.
Carr, J., and Sims, J., concurred.
The petition of real parties in interest and appellants for a hearing by the Supreme Court was denied August 17, 1983.
NOTES
[1] All further statutory references, unless otherwise indicated, are to the Public Resources Code.
[2] Although this document was apparently not introduced into evidence before the city council, superintendent Hemington referred to it at the March 10, 1981, city council hearing and neither City nor Lumsden objected to its admission before the trial court. They have not objected to its consideration on appeal.
[3] District advised City it had adopted a mitigation fee, in addition to the impact fee already imposed, as another method of alleviating the impact of the project. We need not decide the legality of this or any other proposed mitigation measures.